IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


LINDA H. PEACOCK,                          )
                                           )
                                           )
v.                                         )          NO. 2:05-0076
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security[1]         )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION


The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Supplemental Security Income ("SSI") under the Social Security Act (the "Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and this case should be remanded for further action in accordance with the recommendations contained herein.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed an application for SSI on January 16, 2003, alleging disability due to mental disorders, hip injury, and back injury with a date of onset on October 1, 2001. (Tr. 18, 157.) The plaintiff's application for SSI was denied initially on May 6, 2003 and upon reconsideration. (Tr. 14, 52.)

A hearing was held before Administrative Law Judge ("ALJ") William P. Newkirk on September 14, 2004. (Tr. 456-79.) The ALJ delivered an unfavorable decision on January 21, 2005, (Tr. 17-26) and the plaintiff petitioned for a review of that decision before the Appeals Council. (Tr. 8.) The Appeals Council denied the plaintiff's request for review of that decision on June 10, 2005, (Tr. 5-7), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on December 29, 1946, and was 54 years old as of October 1, 2001, her alleged onset date. (Tr. 74, 460.) She did not complete high school but obtained a General Equivalency Diploma ("GED"). (Tr. 86.) The plaintiff's past jobs include work as a manager, cleaner, veterinary technician, and certified nursing assistant. (Tr. 172, 460-62.)

## A. Chronological Background: Procedural Developments and Medical Records

The plaintiff's medical records date back to March 3, 2001, when she presented to Dr. William Kelly, her primary care physician, at Kernersville Primary Care in Kernersville, North Carolina, for nausea, vomiting, and diarrhea. (Tr. 195.) Dr. Kelly diagnosed the plaintiff with viral gastroenteritis, prescribed Phenergan for her, and told her to maintain a diet of clear liquids and

2

bland foods. *Id.* On June 6, 2001, the plaintiff reported to Wake Forest University Baptist Medical Center for a head laceration after hitting her head on a tree branch. (Tr. 194.) She received treatment for the wound and was prescribed Keflex. *Id.*

On July 23, 2001 the plaintiff presented to Dr. Anthony Allen for a back injury after she jumped from the first floor window of a burning house.[2] (Tr. 176-79.) The plaintiff reported moderate dull lower back pain that radiated down her leg and the pain was exacerbated by movement. *Id.* X-rays of the plaintiff's lower back revealed "early degenerative spurring and some degenerative disc disease." (Tr. 184.) Dr. Allen prescribed Valium and Vicodin for the plaintiff. (Tr. 185.)

On October 8, 2001, the plaintiff returned to Dr. William Kelly and complained of lower back pain radiating to her right hip, generalized aches and pains, rashes, chest pain, and depression due to weight problems. (Tr. 191.) Dr. Kelly diagnosed her with psoriasis, lower back pain, chest pain, and a history of panic disorder. *Id.* Dr. Kelly continued the plaintiff's Imipramine prescription for her panic attacks, and he prescribed Valisone cream for her psoriasis and Brethaire for her cough. *Id.*

On January 8, 2002, Dr. J.R. Setty of the North Carolina Disability Determination Services ("DDS") examined the plaintiff and found that she had moderate exogenous obesity, moderate degenerative disc disease, and lower back pain. (Tr. 199.) He opined that the plaintiff's panic

---

[2] For some inexplicable reason, the defendant erroneously relied on the transcript of the hearing, rather than the medical records themselves, in arguing that the plaintiff injured her back in March of 1992, and worked for almost ten years thereafter. *See* Tr. 462; Docket Entry Nos. 13, at 6, and 14, at 2-3.

3

attacks were well controlled by Imipramine. *Id.* X-rays further revealed that the plaintiff had mild to moderate degenerative disc disease with small osteophyte formation. (Tr. 213.)

Dr. David H. Brown, a consultative, non-examining DDS physician, conducted a physical residual functional capacity ("RFC") assessment of the plaintiff on January 23, 2002. (Tr. 200-07.) Dr. Brown opined that the plaintiff could occasionally lift/carry up to fifty pounds, and frequently lift/carry up to twenty-five pounds. (Tr. 201.) Dr. Brown noted that the plaintiff could stand/walk and sit for approximately six hours in an eight hour workday and had unlimited capacity to push and pull. *Id.* Dr. Brown further determined that the plaintiff could climb, balance, stoop, kneel, crouch, and crawl frequently. (Tr. 202.) He also found the plaintiff to have no visual, manipulative, communicative or environmental limitations. (Tr. 203-04.) Dr. Brown noted that the plaintiff's "[s]ymptoms and physical findings are not consistent with [the] objective findings or x-rays . . . [or] with each other." (Tr. 207.) Additionally, he opined that the "clinical picture [is] not consistent with anatomical structures." *Id.*

On March 3, 2002, the plaintiff presented to Dr. Timothy C. King, a DDS psychiatrist, for a psychiatric evaluation. (Tr. 214-16.) Dr. King opined that the plaintiff was alert and capable of communicating adequately despite being irritable. (Tr. 215.) He further indicated that the plaintiff's "[t]hought process [was] notable for normal rate and tone, in organization of speech." *Id.* Dr. King also opined that the plaintiff was depressed and anxious with "frequent thoughts of death," but that she did not possess suicidal or homicidal ideations. *Id.* Dr. King found that the plaintiff was of average intelligence with good concentration and memory; could accurately state the current month, date, year, and season; could recall four of the last five Presidents; could perform simple calculations; could remember three out of three words in a memory test; and could explain the

4

meaning of a proverb. (Tr. 215-16.)  Furthermore, the plaintiff was able to take care of her own

hygiene and perform chores. (Tr. 215.)  Dr. King concluded that the plaintiff had "[m]ajor

depressive disorder, chronic plus panic disorder with agoraphobia," a back injury, and asthma, and

assigned her a Global Assessment of Functioning (GAF) score of 53.[3] (Tr. 216.)

On March 10, 2002, the plaintiff was admitted to John Umstead Hospital in North Carolina

for a suicidal episode. (Tr. 219.)  The hospital records reflected that, while intoxicated, the plaintiff

engaged in an altercation with her boyfriend, cut herself, wrote a suicide note, and told the police

that she was in possession of a gun. *Id.*  Dr. Lou Ann Crume, a psychiatrist, reported that after the

"alcohol exited her system," the plaintiff stated that she was embarrassed by her behavior and that

she "no longer felt as if she wanted to kill herself." (Tr. 225.)  Dr. Crume opined that a build up of

multiple stressors triggered the plaintiff's episode and that her "self-injurious behavior was at least

partially and probably largely caused by her infrequent alcohol use." (Tr. 223.)  A mental status

exam revealed that the plaintiff was "alert and oriented to person, place, time and situation," and that

she could recall three out of three objects in a span of ten minutes. *Id.*  Dr. Crume assigned the

plaintiff a GAF score of 70.[4] *Id.*  Dr. Crume discharged the plaintiff on the following day,

maintained her usual prescription for Imipramine, and referred her to an outpatient treatment

---

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").  A GAF score of 53 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

[4] A GAF score of 70 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

5

program at CenterPoint Human Services in Winston-Salem, North Carolina ("CenterPoint"). (Tr. 224-25.)

On March 21, 2002, Dr. W.W. Albertson, Ed.D., a non-examining DDS psychological consultant, completed a mental RFC and found that the plaintiff was moderately limited in her ability "to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavior extremes; and respond appropriately to changes in the work setting." (Tr. 229-30.) Dr. Albertson opined that the plaintiff was able to understand and remember simple instructions and carry them out, and that she had some difficulty relating to others and with adjusting to changes in a work setting.[5] (Tr. 231.)

Dr. Albertson also completed a Psychiatric Review Technique Form ("PRTF") and diagnosed the plaintiff with depression and anxiety-related disorders. (Tr. 233-46.) He found that she was moderately limited in her daily living activities, in maintaining social functioning, and in maintaining concentration, persistence, or pace. (Tr. 243.) However, Dr. Albertson noted that there was "insufficient evidence" to determine if the plaintiff were functionally limited by episodes of decompensation. *Id.*

---

[5] The Court notes that Dr. Albertson signed but did not actually complete the "Functional Capacity Assessment" portion of the report since the handwriting is clearly different from his handwriting. *See* Tr. 231.

Between April 2, 2002, and June 4, 2002, the plaintiff was treated by Dr. David O'Brien and Dr. Timothy W. McGowen, two orthopedic specialists. (Tr. 248-56.)  On April 2, 2002, the plaintiff reported her pain level as a nine out of ten in severity. (Tr. 255-56.)  She related that Vioxx relieved her pain, but that this relief led her to continue her regular activities and resulted in a return to "her baseline pain." (Tr. 255.)  Dr. McGowen reported that her x-rays indicated degenerative disc disease and "some slight sclerosis at [her] SI [sacroiliac] joint." (Tr. 256.)   Dr. O'Brien gave the plaintiff a "right sacroiliac joint injection" on April 17, 2002. (Tr. 252-53.)  After this injection, on May 15, 2002, the plaintiff reported a fifty percent initial reduction in pain, but also related that the pain returned after "a day or two." (Tr. 254.)  She rated her post-injection pain level as six out of ten at rest and eight out of ten after activity. *Id.*  Dr. O'Brien diagnosed the plaintiff with "[r]ight sacroiliac pain and dysfunction" and scheduled her "for a repeat SI joint injection to see if this again eliminates her pain." (Tr. 251.)  The plaintiff received a second SI joint injection on June 4, 2002, but she left the treatment center before the doctors could assess the amount of pain relief. (Tr. 248.)

From April of 2002 to April 2003, the plaintiff received therapy for her mental impairments at CenterPoint. (Tr. 267-341.)  On April 19, 2002, Dr. Ureh N. Lekwauwa, a psychiatrist, conducted an initial evaluation of the plaintiff and found her mood to be generally anxious and her affect to be pleasant.[6] (Tr. 335-38.)  He also opined that the plaintiff was "not psychotic, suicidal, or homicidal." *Id.*  Dr. Lekwauwa "rule[d] out" panic disorder and borderline personality disorder as possible diagnoses, and assigned the plaintiff a GAF score of 65.[7] (Tr. 338.)  He diagnosed plaintiff with "a

---

[6] Although the plaintiff refers to the date of Dr. Lekwauwa's evaluation as April 29, 2002 (Docket Entry No. 12, at 7), it appears that the correct date is April 19, 2002. *See also* Tr. 333.

[7] A GAF score of 65 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning but generally functioning pretty well, has some

-7-

lot of anxiety symptoms" and found that her difficulty with handling stressful situations caused her to become self-destructive. (Tr. 337.)   Dr. Lekwauwa also reduced the plaintiff's dosage of Imipramine, prescribed Paxil for her, and opined that she would benefit from therapy for her anxiety and "characterological problems." (Tr. 338.)

On May 14, 2002, the plaintiff returned to Dr. Lekauwua and related that although Paxil made her "calmer and able to handle stress better," she felt dizzy when waking up in the morning. (Tr. 330.)  Dr. Lekauwua noted that the plaintiff had "improved some" and prescribed Imipramine and Paxil for her. *Id.*  On June 17, 2002,  Dr. Lekwauwa maintained the plaintiff's prescription for Imipramine and Paxil. (Tr. 329.)

From June 2002 until February 2003, plaintiff took part in multiple anxiety group therapy sessions conducted by Ms. Joy Marcum, a social worker at CenterPoint. (Tr. 278-328.) Ms. Marcum noted that she participated "well" in the first session on June 18, 2002, and was "comfortable in the group." (Tr. 328.) The plaintiff generally participated in the therapy sessions, was supportive of other members (Tr. 301, 306-08, 311),[8] discussed her occasional desire to cut herself (Tr. 293, 295, 303, 314, 316), and expressed frustration over her living situation with her daughter and with having to move. (Tr. 296, 299, 300, 304-05, 312-13.)  Ms. Marcum also requested that the plaintiff attend Dialectical Behavior Therapy ("DBT"), but the plaintiff did not attend any DBT sessions. (Tr. 278-79, 295-96.)  After Ms. Marcum left CenterPoint, the plaintiff continued attending group therapy meetings conducted by Mr. Andy Moretz, M.Ed., from March 11, 2003, to April 1, 2003. (Tr. 269-

---

meaningful interpersonal relationships." DSM-IV-TR at 34.

[8] On October 22, 2002, Ms. Marcum noted that members of the anxiety therapy group viewed the plaintiff "as a source of strength in the room." (Tr. 307.)

-8-

70, 273-74.)  Mr. Moretz noted that plaintiff actively participated in group meetings (Tr. 269-70, 273-74) and discussed how "her own self-cutting and self-harming behaviors [have] become her comfort zone to deal with more overwhelming feelings of not wanting to deal with the outside world." (Tr. 273.)

Dr. Katherine Marshall, a psychiatrist at CenterPoint, also treated the plaintiff between July 2002 to April 2003. (Tr. 294, 309, 318, 323-24.)  On July 10, 2002, Dr. Marshall examined the plaintiff and found that she had a depressed, tired, and anxious mood; "blunted" affect; adequate cognitive functioning; superficial judgment and insight; and no "suicidal or homicidal intent [despite] transient suicidal thoughts." (Tr. 324.)  Dr. Marshall diagnosed the plaintiff with "Panic Disorder with Agoraphobia" and the possibility of "Borderline Personality Disorder." *Id.* Dr. Marshall also prescribed Imipramine and Paxil for the plaintiff. *Id.*  The plaintiff returned to Dr. Marshall on August 9, 2002, and Dr. Marshall indicated that the plaintiff's "panic symptoms have diminished and [she] cannot remember when she last had one." (Tr.319.) Dr. Marshall noted that the plaintiff still complained of "some anxiety and depression but overall she [had] improved." *Id.*  She found the plaintiff's mood to be "slightly depressed and anxious;" her affect "broad;" her cognitive functioning, judgement, and insight adequate; and that she had "[n]o suicidal or homicidal ideation." *Id.*  Dr. Marshall maintained the plaintiff's prescription of Imipramine and Paxil, and she noted that the plaintiff had improved, was stable, and displayed manageable symptoms. *Id.*

On October 8, 2002, the plaintiff returned to Dr. Marshall and related that although she avoids going to the mall because of her anxiety, she is able to attend church and participate in "other community activities." (Tr. 309.)  Dr. Marshall noted that the plaintiff was taking her medication without difficulty and that her "anxiety symptoms and her depression have improved with

-9-

medication even though her symptoms aren't completely resolved." *Id.* Dr. Marshall again diagnosed the plaintiff with "Panic Disorder with Agoraphobia" and the possibility of "Borderline Personality Disorder," and she continued to prescribe Imipramine and Paxil. *Id.* On January 28, 2002, the plaintiff presented to Dr. Marshall and reported that she was "not getting along with her daughter," had increased panic symptoms and anxiety, and had cut herself again. (Tr. 294.) Dr. Marshall diagnosed the plaintiff with "Panic Disorder with Agoraphobia, Alcohol Abuse in remission and Borderline Personality Disorder," and she increased the plaintiff's dosage of Paxil and maintained her dosage of Imipramine. *Id.*

Dr. Marshall's final examination of the plaintiff occurred on April 8, 2003, and she noted that the plaintiff was having conflicts with her family members, had occasional anxiety symptoms, had "depressed and anxious moods," and had cut herself to relieve stress. (Tr. 267.) Dr. Marshall opined that although the plaintiff still struggled with her emotions "her anxiety symptoms are manageable," and that her functioning, judgment, and insight were all adequate. (Tr. 267-68.) Dr. Marshall's diagnosis of the plaintiff and medications that she prescribed for the plaintiff remained unchanged. (Tr. 268.)

On July 31, 2002, the plaintiff presented to Dr. Frank L. Virgili, a DDS consultative physician, and he determined that the plaintiff could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, stand/walk and sit for approximately six hours in an eight hour workday, and had an unlimited capacity to push and pull. (Tr. 343.) Dr. Virgili also found the plaintiff to have no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 344-46.)

-10-

The plaintiff presented to Dr. Catherine Messick on February 13, 2003, for an evaluation of her blood pressure and general medical care. (Tr. 284-85.) Dr. Messick diagnosed the plaintiff with elevated blood pressure and prescribed Hydrochlorothiazide for her. *Id.* The plaintiff returned to Dr. Messick on March 7, 2003, for a follow up visit, and Dr. Messick found the plaintiff's blood pressure to be well controlled and the plaintiff denied any problems with chest pains or headaches. (Tr. 275.)

On February 28, 2003, Dr. Margaret D. Barham, a non-examining DDS consultative psychologist, completed a PRTF on the plaintiff. (Tr. 351-64.) Dr. Barham diagnosed the plaintiff with panic disorder with agoraphobia, a borderline personality disorder with self-mutilation, and a history of alcohol dependence. (Tr. 356, 358-59.) Dr. Barham opined that the plaintiff had a mild degree of limitation in "restriction of daily living activities" and in "difficulties with maintaining social functioning," moderate "difficulties in maintaining concentration, persistence or pace," and exhibited one or two "repeated episodes of decompensation, each of extended duration." (Tr. 361.) Dr. Barham also completed a mental RFC on February 28, 2003, and noted that the plaintiff was moderately limited in her ability "to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to travel in unfamiliar places or use public transportation." (Tr. 365-66.) Dr. Barham concluded that the plaintiff "is able to understand and remember simple directions," has some deficits in her ability to sustain concentration but "is able to sustain sufficient concentration to complete simple routine

-11-

tasks," is able "to accept direction from a supervisor and maintain adequate relationships with co-workers," and "may have some difficulty adapting to change, but will be able to function with a stable work assignment." (Tr. 367.)

On March 10, 2003, Dr. Edward Woods, a non-examining DDS physician, completed a physical RFC of the plaintiff and found that she could lift/carry up to fifty pounds occasionally and up to twenty-five pounds frequently, could stand/walk or sit about six hours in an eight hour day, and had unlimited pushing and pulling capabilities. (Tr. 370.) Dr. Woods opined that the plaintiff had no postural, manipulative, visual, or communicative limitations, but he did conclude that she should avoid exposure to fumes, odors, dusts, gases, and poor ventilation because of her asthma. (Tr. 372-74.)

On July 8, 2003, plaintiff presented to the Volunteer Behavioral Health Care System ("VBHCS") as a walk-in patient and reported that she was running out of her medication.[9] (Tr. 417.) Joanna Bartlett, M.A. Ed. in psychology, told the plaintiff that it would "be awhile after her case opening before she could see a doctor" and that she should visit the emergency room if she needed crisis services. *Id.* The plaintiff returned to VBHCS on July 18, 2003, for a clinical intake assessment (Tr. 413-16) and she reported that she self-mutilates when under stress and has attempted suicide in the past.[10] (Tr. 413-14.) The plaintiff was diagnosed with "bipolar I disorder, most recent episode manic, severe without psychotic features; anxiety disorder NOS [not otherwise specified];

---

[9] The plaintiff reported that if she went off her medication that it would not "be pretty," but she clarified that statement by acknowledging that she was not going "to hurt herself or anyone else." (Tr. 417.)

[10] The Court is not able to determine who completed the plaintiff's intake assessment because the sixth page of the "Clinical Intake Assessment" is missing from the record.

-12-

[and] borderline personality disorder." (Tr. 416.) She was also assigned a GAF score of 50[11] and referred for counseling and medication management. *Id.*

From October 17, 2002, until June 8, 2004, Dr. Rosalia Dominguez, a psychiatrist with VBHCS, treated the plaintiff on multiple occasions.[12] (Tr. 381-83, 385-92, 394-98, 400-01, 405-12.) Dr. Dominguez focused on treating the plaintiff's "[m]ood liability, hx [history] of delusional behavior and auditory hallucinations, COA/FOE, [and] disorganized thoughts." (Tr. 409.) She also diagnosed the plaintiff with "bipolar I disorder, most recent episode manic, unspecified [and] borderline personality disorder." (Tr. 383, 385, 287, 390, 394, 396, 398, 400.) The plaintiff had previously been prescribed Depakote,[13] Zyprexa,[14] and Seroquel,[15] but these medications caused her to have a skin rash, mood changes, manic feelings followed by sadness, and vague paranoia.[16] (Tr. 400-01.) Given these adverse affects, Dr. Dominguez changed the plaintiff's medication regimen back to Imipramine and Paxil (Tr. 400), and the plaintiff showed improvement. (Tr. 394,

---

[11] A GAF score of 50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[12] The Court notes that several pages from Dr. Dominguez's evaluations of the plaintiff are missing from the record.

[13] Depekote is used to treat "manic episodes of bipolar disorder." Saunders Pharmaceutical Word Book 210 (2009) ("Saunders").

[14] Zyprexa is a "novel (atypical) antipsychotic for schizophrenia and manic episodes of a bipolar disorder." Saunders at 782.

[15] Seroquel is a "novel (atypical) dibenzothiazepine antipsychotic for schizophrenia and both manic and depressive episodes of a bipolar disorder." Saunders at 639.

[16] It is not clear from the record when the plaintiff began taking Depekote, Zyprexa, or Seroquel, or who prescribed this series of medications for her.

-13-

396, 398.)  On December 22, 2003, Dr. Dominguez prescribed Geodon[17] for the plaintiff. (Tr. 397.)

On February 20, 2004, the plaintiff reported that she had a "bad week," and Dr. Dominguez

decreased the plaintiff's dosage of Paxil and increased her dosage of Geodon. (Tr. 391)  On

February 27, 2004, Dr. Dominguez added Zyprexa to the plaintiff's medication regimen. (Tr. 389.)

After taking this new combination of medication, Dr. Dominguez noted that the plaintiff did not

have any complaints or manic symptoms, was doing better with this combination of medication, and

that her "shaky" feeling was gone. (Tr. 387.)  The plaintiff returned to Dr. Dominguez on April 16,

2004, and reported that she still had mood swings but that her mood swings occurred with "less

frequency." (Tr. 385.)

The plaintiff also presented to Ms. Carol Tharp, LPC/MHSP,[18] in order "to learn and practice

healthy coping skills" for controlling her "mood swings, depression, anxiety, [and] anger problems."

(Tr. 407.)  The plaintiff met with Ms. Tharp on multiple occasions between September 18, 2003, and

May 17, 2004. (Tr. 382, 384, 393, 399, 402-04.)  On October 16, 2003, the plaintiff reported that

although she was not sure if her medications were working, the medications did "keep her from

loosing [sic] her temper and really getting angry." (Tr. 402.)  Nearly a month later, the plaintiff

reported to Ms. Tharp that she began having negative side effects from her new medications and had

to stop taking them. *Id.*  Ms. Tharp's therapy sessions with the plaintiff focused on helping her work

through her past abuse, feelings, and emotions. (Tr. 393, 399.)  On January 20, 2004, Ms. Tharp

noted that the plaintiff "appeared more depressed" (Tr. 393), and on May 3, 2003, the plaintiff

---

[17] Geodon is a "novel (atypical) benzisoxazole antipsychotic for schizophrenia and manic episodes of a bipolar disorder." Saunders at 318.

[18] A LPC/MHSP is a Licensed Professional Counselor/Mental Health Service Provider.

-14-

related that she still felt depressed and had the urge to cut herself, but that she was able to attend church. (Tr. 384.)  Ms. Tharp's final session with the plaintiff took place on May 17, 2004, and the plaintiff reported that she was having problems with "social isolation/withdrawal" and that she was spending most of her time helping take care of her mother. (Tr. 382.)

After moving to Tennessee, on July 10, 2003, the plaintiff presented to the Tennessee Department of Health and reported that she "cuts herself" but that she is not suicidal.[19] (Tr. 443-44.) The plaintiff was diagnosed with anxiety, panic disorder, and right hip pain (Tr. 419, 431, 441, 444), and the treatment notes indicated that the plaintiff needed to "see [a doctor] for psychiatric help." (Tr. 438.)  The plaintiff was prescribed both Imipramine and Paxil. (Tr. 419, 437, 444.)  On October 1, 2003, the plaintiff reported that she was "feeling better," and on October 14, 2003, the plaintiff related that even though she has her "ups and downs . . . she is much better on her medication than not." (Tr. 436.)  The plaintiff's medical records from the Tennessee Department of Health indicate that her prescriptions for Paxil and Imipramine were discontinued on October 15, 2003.[20] (Tr. 419.)

---

[19] The plaintiff's treatment notes from the Tennessee Department of Health are stamped as having been reviewed by Dr. Debbee Sidrys, but it is clear from the notes that various medical professionals examined the plaintiff. (Tr. 419-45.)

[20] Although the plaintiff's medical records from the Tennessee Department of Health show that the plaintiff's prescriptions for Paxil and Imipramine were discontinued on October 15, 2003 (Tr. 419), treatment notes from the preceding day, October 14, 2003, indicated that the plaintiff was to "continue [her] present medications." (Tr. 436.)

-15-

**B. Hearing Testimony: The Plaintiff and a Vocational Expert**

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Edward Smith, a Vocational Expert ("VE"), testified. (Tr. 457-79.)

The plaintiff testified that she previously worked as a certified nursing assistant, at a veterinary clinic, at an animal hospital, and for a fire prevention company. (Tr. 460-62.) The plaintiff explained that she stopped working in March of 2002 (Tr. 460), because of physical problems that she suffered from jumping out of a window during a house fire in March of 1992. (Tr. 462-63.) The plaintiff testified that she received shots for hip pain and that the shots temporarily relieved her discomfort. (Tr. 463.)

The plaintiff testified that she had been receiving mental health care for "nine or [ten] months," and that she visits a therapist twice per month and a psychiatrist once per month. (Tr. 466.) The plaintiff related that she first sought mental health care in either 2001 or 2002 in North Carolina. *Id.* She claimed that group therapy did not work because she had difficulty accepting criticism, but that she felt that her new doctors were helping her "get to the bottom of" her problems. (Tr. 467.)

The plaintiff testified that even though she is able to crawl, it hurts her back; that she is able to lift fifteen pounds; and that she can stand/sit for thirty minutes without pain. (Tr. 467-68.) She also stated that she "can't do much of anything in [sic] walking," is not able to reach over her head, and does not write very much. *Id.* The plaintiff related that she does not take pain medication and would rate her pain, on a daily basis, as eight out of ten. (Tr. 468.) The plaintiff explained that she no longer takes medication for her pain because the medication would "stop the pain" and then she would "do something stupid like lift something . . . ." *Id.*

-16-

The plaintiff reported that she has an anger problem, difficulty working with others, short-term memory loss, and difficulty concentrating and understanding instructions. (Tr. 469, 471-72.) The plaintiff testified that she takes Paxil and Imipramine for "the mental problems," and Zyprexa for "the bipolar." (Tr. 472.) The plaintiff also testified that she takes Naproxen, Depakote, and Glyburide for "bipolar," and Protonix and "Morjulak [sic]" for schizophrenia. (Tr. 473.) The plaintiff related that she had suicidal episodes when she lived in North Carolina, that she has panic attacks "[a]ll the time," and that she only goes out in public if "absolutely necessary." (Tr. 474.) The plaintiff further stated that she is able to drive but prefers to have someone drive her, and that she can perform household chores if she is given repeated instructions. (Tr. 474-75.)

The VE testified that the plaintiff's past work included being a certified nursing assistant at the medium, semi-skilled level; a veterinary technician at the medium, semi-skilled level; a cleaner at a veterinary clinic at the light, unskilled level; and a receptionist in the fire industry at the sedentary to light, semi-skilled level, depending on her duties. (Tr. 475-76.)

The ALJ asked the VE to list job opportunities for a hypothetical individual of plaintiff's age, education, and work experience in addition to the medical information contained in Dr. Barham's PRTF (Tr. 351-64), in Dr. Barham's mental RFC (Tr. 365-68), and in Dr. Woods's physical RFC. (Tr. 369-76.) The VE responded that the plaintiff could perform the following jobs given the identified restrictions: at the medium work level she could work as a hand packager, laundry laborer, and women's room attendant; at the light work level, she could work as a photocopy machine operator, laundry folder, and textile checker; and at the sedentary level she could work as an addresser, table worker, and assembler. (Tr. 476-77.)

-17-

The plaintiff's attorney then asked the VE to consider whether the plaintiff would be able to perform those jobs if she had great difficulty following instructions, problems with working and interacting with the public, and difficulty with anger control. (Tr. 478.) The VE responded that difficulty with following instructions and working and interacting with the public would not affect the plaintiff's ability to perform the jobs that he listed. (Tr. 478.) However, the VE also testified that he would need additional information concerning the nature and severity of the plaintiff's anger control issue before responding. (Tr. 479.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on January 21, 2005. Based on the record, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's combination of impairments are considered severe" based on the requirements in the Regulations 20 CFR§ 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant has the residual functional capacity to perform medium exertional work with no concentrated exposures to fumes, odors, dusts, gases, poor ventilation. Because of the claimant's mental impairments, she requires a low stress work environment but is able to understand and remember simple direction; sustain sufficient concentration to complete simple routine tasks; accept direction from supervisors; maintain adequate relationships with co-workers; and function in a stable work assignment.

-18-

6.      The claimant is unable to perform her past relevant work (20 CFR § 416.965).

7.      The claimant is an "individual of advanced age" (20 CFR § 416.963).

8.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 416.964).

9.      The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

10.     The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).

11.     Although the claimant's exertional limitations do not allow her to perform the full range of medium work, using Medical-Vocational Rule 203.15 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include [sic] are included in the body of this decision.

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(Tr. 25.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial

-19-

evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger,* 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.,* 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (Citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g. Dinkel v. Sec'y of Health & Human Servs.,* 910 F.2d 315, 318 (6th Cir. 1990).

-20-

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.,* 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen,* 874 F.2d 1116, 1122 (6th Cir. 1989).

-21-

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.,* 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g.*, *Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied,* 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her,* 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[21] *Id. See also Tyra v. Sec'y of Health & Human Servs.,* 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

---

[21] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch,* 435 F.2d 239, 241 (6th Cir. 1970).

-22-

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 25.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since October 1, 2001, the alleged onset date of disability. *Id.* At step two, the ALJ found that the combination of plaintiff's degenerative disc disease, sacroiliac pain, hypertension, diabetes II, a depressive disorder, and a panic disorder were severe impairments. (Tr. 20.) At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 25.) At step four, the ALJ determined that the plaintiff could not perform her past relevant work. *Id.* At step five, the ALJ found that the plaintiff had the residual functional capacity to perform medium exertional work in a low-stress environment with restrictions on "exposure to fumes, odors, dust, gases, [and] poor ventilation." *Id.*

### C. Plaintiff's assertions of error

The plaintiff contends that the ALJ erred in assessing the medical opinions of the plaintiff's treating physicians, Dr. Katherine Marshall and Dr. Rosalia Dominguez. She also alleges that the ALJ erred by asking the VE a hypothetical question which did not take into account all of the plaintiff's mental impairments, and that the VE's testimony does not constitute substantial evidence

since it was made in response to the ALJ's flawed hypothetical. The plaintiff further contends that the ALJ erred by failing to inquire whether any of the jobs enumerated by the VE were part-time.

### 1. The ALJ properly assessed the medical evidence of Dr. Katherine Marshall and Dr. Rosalia Dominguez, the plaintiff's treating physicians.

Dr. Marshall first examined the plaintiff on July 10, 2002, and diagnosed her with "Panic Disorder with Agoraphobia" and the possibility of "Borderline Personality Disorder." (Tr. 323-24.) Over the next nine months, Dr. Marshall had three follow-up visits with the plaintiff. *Id.* Dr. Rodriguez first examined the plaintiff on October 17, 2002, and diagnosed her with "[m]ood liability, hx [history] of delusional behavior and auditory hallucinations, COA/FOE, [and] disorganized thoughts." (Tr. 409.) Over the next nineteen months, Dr. Rodriguez examined the plaintiff 11 times. (Tr. 381-83, 385-92, 394-98, 400-01, 405.) Given the regularity that Dr. Marshall and Dr. Rodriguez examined the plaintiff, both physicians are classified as treating sources under 20 C.F.R. § 416.902.[22] The plaintiff argues that the ALJ erred by failing to apply the treating physician rule. Docket Entry No. 12 at 11-15.

---

[22] A treating source, defined by 20 C.F.R. § 416.902, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

-24-

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting SSR 96-2p, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. SSR 96-2p, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

-25-

The reason giving requirement also exists so plaintiffs "'understand the disposition of their cases'" and to "ensure[] that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544-45 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999), and citing *Halloran v. Barnhardt*, 362 F.3d 28, 32-33 (2d Cir. 2004)).

In this case, the ALJ carefully laid out the different sections of the regulations and the SSRs that he applied, including 20 C.F.R. § 416.927. (Tr. 22.) He then discussed the plaintiff's medical records that corresponded to her physical limitations and concluded that the plaintiff was able to perform medium exertional work "as opined by state agency reviewing physicians." (Tr. 22.) In his analysis, the ALJ referenced the plaintiff's treating orthopedic physician by speciality and not by name,[23] but it can be inferred that the ALJ was referring to Dr. O'Brien.[24] (Tr. 22, 248-56.) It is also clear that the ALJ afforded a certain amount of positive weight to the orthopedist's medical findings since he emphasized that "[i]t is important to note that the [plaintiff's] orthopedic physician placed no functional restrictions on the [plaintiff]. Given the [plaintiff's] allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the [plaintiff] by the treating doctor." (Tr. 22.) The phrase "it is important to note" indicates that the ALJ assigned a certain amount of positive weight to the orthopedist's medical findings. *Id.* The ALJ further complied with the "good reasons" requirement of SSR 96-2p by noting that the treating

_____

[23] The ALJ did refer earlier to Dr. O'Brien by name in describing the plaintiff's medical records. (Tr. 19.)

[24] The plaintiff was examined by two orthopedists, Dr. O'Brien and Dr. McGowan. (Tr. 248-56.) Dr. McGowan examined the plaintiff once and Dr. O'Brien examined the plaintiff three times. *Id.* Given Dr. O'Brien's treatment relationship with the plaintiff, he would be classified as a treating source under 20 C.F.R. § 416.902. However, Dr. McGowan would not be classified as a treating source since his single examination of the plaintiff does not satisfy the "frequency" requirement of 20 C.F.R. § 416.902.

-26-

orthopedist's medical reports were consistent with the rest of the record since the reports did not indicate that the plaintiff had any physical restrictions, despite the plaintiff's "allegations of totally disabling symptoms." *Id.*

The ALJ did not, however, engage in the same analysis of the plaintiff's mental limitations as he did in addressing her physical limitations. The ALJ concluded:

> The evidence indicates [that the plaintiff] handles stress very poorly. However, it is reported that Paxil helps with stress and that she is calmer when compliant with medication. It is significant that the [plaintiff] actively sought out [a] mental health professional when relocating to other states. She also regularly attended counseling sessions and was support[ive] and cooperative throughout. Although the [plaintiff's] GAF (Global Assessment of Functioning) score sometime[s] indicated serious symptoms, the majority of assessments indicated mild to moderate symptoms. Thus, I give weight to the state agency reviewing psychologists who determined the opinions that the claimant could understand and remember simple direction[s], sustain sufficient attention to complete simple routine tasks, maintain adequate relationships with co-workers and function with a stable work assignment.

(Tr. 22-23.) (Internal citations omitted.) It is clear that the ALJ gave controlling weight to the medical findings of the state agency psychologists, but he does not reference either Dr. Marshall or Dr. Dominguez in a discernible manner, such as by name or by specialty, making it difficult to determine what weight or consideration he gave, if any, to either treating psychiatrist. *Id.*

Although it can be inferred that the ALJ did not assign controlling weight to the findings of either Dr. Marshall or Dr. Dominguez, he is still required to provide "good reasons" that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). As noted in *Wilson*, 378 F.3d at 544-45, this requirement exists so plaintiffs are able to understand how their case was decided and to ensure the ALJ applied the treating physician rule. Simply stating that "the majority of assessments indicated mild to

-27-

moderate symptoms" (Tr. 22) does not satisfy the good reason requirement because there are several

other physicians and case managers, besides Dr. Marshall and Dr. Dominguez, who have evaluated

and treated the plaintiff to which the ALJ's rationale could be attributed. (Tr. 267-341, 381-417.)

The ALJ's lack of specificity gives rise to a level of confusion that is avoidable when 20 C.F.R.

§ 416.927(d) and SSR 96-2p are properly applied.

Even though substantial evidence may support the ultimate decision of the ALJ in this case,

the ALJ failed to apply 20 C.F.R. § 416.927(d) with the clarity and specificity as required by SSR

96-2p. As noted by *Wilson*, reversal "is required" where the agency "fail[s] to follow its own

procedural regulation, and the regulation was intended to protect applicants like [the plaintiff]."[25]

378 F.3d at 544. Thus, this case must be remanded in order for the ALJ to identify the weight he

---

[25] *Wilson* explained that

> [i]t is an elemental principle of administrative law that agencies are
> bound to follow their own regulations. As the Ninth Circuit well
> summarized in applying this principle:
>
>> The Supreme Court has long recognized that a federal
>> agency is obliged to abide by the regulations it
>> promulgates. An agency's failure to follow its own
>> regulations "tends to cause unjust discrimination and
>> deny adequate notice" and consequently may result in
>> a violation of an individual's constitutional right to
>> due process. Where a prescribed procedure is
>> intended to protect the interests of a party before the
>> agency, "even though generous beyond the
>> requirements that bind such agency, that procedure
>> must be scrupulously observed."

378 F.3d at 544-45 (internal citations omitted) (citing *Sameena, Inc. v. United States Air Force*, 147
F.3d 1148, 1153 (9th Cir. 1998) (quoting *Vitarelli v. Seaton*, 359 U.S. 535, 547, 79 S.Ct. 968, 3
L.Ed.2d 1012 (1959) (Frankfurter, J., concurring))).

-28-

assigned the medical opinions of Dr. Marshall and Dr. Dominguez and to provide specific reasoning for that weight.[26]

The Court will not address the plaintiff's remaining allegations of error since the ALJ's evaluation of treating psychiatrists' medical findings and the weight that he assigns to those findings may affect the hypotheticals that he poses to the VE and whether those hypotheticals upon which he ultimately relies are supported by substantial evidence in the record.

---

[26] The Court notes that the plaintiff did not specifically contend that the ALJ erred because he failed to provide good reasons for rejecting the opinions of her treating physicians. However, the plaintiff's assignment of error for failure to apply the treating physician rule, by implication, incorporates not only failure to give deference to the opinions of treating physicians but also failure to provide good reasons for not giving them controlling weight.

## IV. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 12) be GRANTED to the extent that the case should be remanded to the ALJ to properly evaluate the medical findings of two of the plaintiff's treating psychiatrists.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

-30-